UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                       )
MT "BALTIC COMMANDER"                  )
SCHIFFAHRTSGESELLSCHAFT MBH & CO.      )
KG, as Owner of the M/V BALTIC         )       CIVIL ACTION
COMMANDER I, and as claimant to the)           NO. 10-10597-WGY
substitute res:                        )
a certain letter of undertaking        )
dated January 6, 2009,                 )
                                       )
                     Plaintiff,        )
 v.                                    )
                                       )
MASSACHUSETTS PORT AUTHORITY,          )
                                       )
                     Defendant.        )
_____)
                                       )
MASSACHUSETTS PORT AUTHORITY,          )
                                       )
     Plaintiff in counterclaim,        )
                                       )
 v.                                    )
                                       )
M/V BALTIC COMMANDER I                 )
her engines, tackle, equipment,        )
apparel, and appurtenances,            )
etc, in rem; and MT "BALTIC            )
COMMANDER"                             )
SCHIFFAHRTSGESELLSCHAFT MBH & CO.      )
KG and                                 )
ASSURANCEFORENINGEN                    )
GARD-GJENSIDIG, in personam,           )
                                       )
     Defendant in counterclaim.        )
_____)
```

FINDINGS, RULINGS, AND ORDER

YOUNG, D.J.                              January 24, 2013

     On July 25, 2012, after a jury-waived trial in admiralty,

this Court awarded the Massachusetts Port Authority ("Massport")

1

$285,145 as damages resulting from the allision of the <u>M/V</u> <u>BALTIC COMMANDER I</u> with an old wharf owned by Massport at its Castle Island facility.  <u>See</u> Findings and Rulings rendered <u>ore tenus</u> on July 25, 2012 ("Findings and Rulings").

The <u>BALTIC COMMANDER I</u> is owned by MT "BALTIC COMMANDER" Schiffahrtsgesellshaft mbH & Co. KG (collectively, "BALTIC COMMANDER") and is insured by Assuranceforeningen Gard-Gjensidig ("GARD").

This further opinion addresses Massport's claim that GARD so failed its duty under Massachusetts General Laws Chapter 176D, Section 3(9)(d), (f), and (g) to engage in fair claims settlement practices that it is directly liable to Massport for damages and attorneys' fees pursuant to Massachusetts General Laws Chapter 93A, Section 9(1) ("Chapter 93A").  As this Court has already found no willful or knowing violation of Chapter 93A, only single damages are available against GARD, Mass. Gen. Laws ch. 93A, § 11, and this case comes down to deciding whether to award attorneys' fees to Massport.

**I. FINDINGS OF FACT**

On December 31, 2008, the <u>BALTIC COMMANDER I</u> lost steerage way and its bow crunched into Berth 14 of Massport's Castle Island terminal.  The liability of the vessel interests, conceded before trial, was reasonably clear from the outset.  Indeed, to avoid arrest of the vessel, the owner submitted a letter of

understanding in the amount of $2,500,000.

Berth 14 is an old wharf not in active use but hardly
without value.  The allision demolished a portion of the wharf;
caused broken, creosote-soaked logs to float free into Boston
Harbor; and raised the immediate risk of further debris floating
off to pose a hazard both to navigation and to the environment.
Massport necessarily and properly undertook prompt clean-up
efforts.

At the request of the vessel interests, the parties held a
joint survey of the impact site.  Duncan Mellor, the surveyor
retained by the vessel interests, submitted his report on
February 27, 2009, opining that the reasonable cost of repairing
Berth 14, including the cost of removing the damaged structure,
was $280,321.  Counsel for the vessel interests forwarded this
report to Massport on April 28, 2009 and expressed the vessel
interests' view that, applying straight-line depreciation for the
age and condition of Berth 14, immediately before the allision
the value of that portion of the wharf damaged by the BALTIC
COMMANDER I was $1,062.

In the meantime, Massport incurred and paid $119,100 to
clean-up and secure the damaged portion of Berth 14.  Massport
has never actually repaired the "bite" taken out of the wharf by
the BALTIC COMMANDER I.

On September 23, 2009, Massport counsel claimed damages from

3

the vessel interests in the amount of $710,623.02.  Inexplicably, Massport did not forward with this demand evidence that it had already expended $119,100 to clean up the damage.  On October 26, 2009, the vessel interests (unaware of the extent of the clean-up costs) made an offer of $10,000 to settle the claim.

Four months later, having heard nothing from Massport, counsel for the vessel interests wrote, threatening, "If we do not have your client's response by March 5, 2010, we will petition the court to relieve our client [from] the Letter of Understanding."

Massport then made a formal demand pursuant to Massachusetts General Laws Chapter 93, Section 9 seeking damages of $710,623.02.

On April 9, 2010, the vessel owner rejected this demand, reiterated its offer of $10,000, and commenced this action.

More than a year went by; then the vessel owner sought formal discovery and learned for the first time on August 12, 2011, that Massport had incurred expenses of $119,100 to clean up and secure Berth 14.

A mediation session failed, although the vessel owner came up to $75,000 and Massport reduced its demand to $650,000.  The parties' settlement posture remained unchanged through two subsequent mediation sessions, though the vessel owner formally conceded liability on December 1, 2011.

4

The parties' settlement posture remained unchanged over the next seven months during the final run-up to trial.  What happened next illustrates the truth of the adage that "[n]othing so concentrates the trial lawyer's mind as the prospect of a trial on the morrow."  <u>United States</u> v. <u>Massachsetts</u>, 781 F. Supp. 2d 1, 3 (D. Mass. 2011) (quoting <u>Brookridge Funding Corp.</u> <u>v. Aquamarine, Inc.</u>, 675 F. Supp. 2d 227, 230 (D. Mass. 2009)) (internal quotation marks omitted).  As accurately described by Massport:

> As of the date — July 12, 2012 - that this case was transferred from the cognizance of Judge O'Toole to that of Judge Young,[1] the highest offer that had been communicated to

---

[1] Throughout this period, Judge O'Toole was the most productive judge in this Court (i.e., most time on the bench, most trial time, most civil cases tried, and most criminal cases tried).  Internal Statistics, U.S. Dist. Court for the Dist. of Mass., Jan-July, 2012 (Mar. 28, 2012) (on file with Judge William G. Young (D. Mass.)).  In contrast, I was trolling for cases. Accordingly, he graciously transferred this trial-ready civil case to me.  <u>See</u> Local Rule 40.1(I).

For the productivity ranking of the entire District of Massachusetts, see Letter from Judge William G. Young, U.S. Dist. Court for the Dist. of Mass., to Prof. Stephen N. Subrin, Ne. Sch. of Law, Re: District Court Productivity and Case Processing apps. A-B (June 4, 2012) (on file with Judge William G. Young (D. Mass.)) [hereinafter 2009-2010 Federal District Court Productivity Data]; and America's Most Productive Federal District Courts, Fiscal Year Period Ending September 30, 2011 (on file with Judge William G. Young (D. Mass.)) [hereinafter 2011 Federal District Court Productivity Data].  Massachusetts was 27th in 2009, 18th in 2010, 35th in 2011.  <u>See</u> 2009-2010 Federal District Court Productivity Data; 2011 Federal District Court Productivity Data.  The slippage is due to no lack of effort but to the effect of judicial vacancies going unfilled in this district.  <u>See</u> Transcript of Proceedings, Panel at the U.S. District Court for the District of Massachusetts 2012 Bench and Bar Conference: The Vanishing Trial (Oct. 19, 2012) (on file with Judge William G. Young (D. Mass)); <u>see also</u> Jake D. Pugh, Another Nail in the [Trial Model] Coffin? Whether Federal District Court

Massport was $75,000.  On that date, counsel for the parties
appeared at Judge O'Toole's courtroom for a long-scheduled
pre-trial, and were told that the case had been transferred to
Judge Young.  Counsel then proceeded to the courtroom of Judge
Young, had a brief conference with him at sidebar, and were
instructed to return to complete the pre-trial the next
morning.

    On the morning of July 13, 2012, counsel for both parties
did so.  After the conclusion of the pre-trial, as counsel
were proceeding out of the conference room, counsel for Vessel
Interests communicated a verbal settlement offer of $200,000.
This amount was later increased to $250,000.

Massport's Post-Trial Br. Regarding 93A/176D Claim 6-7, ECF No.
41.

## II. RULINGS OF LAW

Here GARD wisely concedes personal jurisdiction and makes no

suggestion that it was not calling the shots with respect to the

settlement or trial of this matter.  Both these forgone arguments

are non-starters, serving only to cause Massport to waste a

portion of its twenty page brief.  See Local Rule 7.1(b)(4).[2]

Instead, GARD argues that federal admiralty law preempts the

application of Massachusetts General Laws Chapter 93A in the

---

Vacancies Push Adjudication Toward an Administrative Model
(unpublished manuscript, on file with Judge William G. Young (D.
Mass.)) (detailing this systemic phenomenon throughout the
federal district courts).

    [2] Equally peripheral is Massport's argument that GARD made a
conclusive judicial admission of improper claims handling since
it had contended in its answer that, as the vessel's owners were
the insured parties, GARD itself had made no settlement offers at
all.  This did not constitute a judicial admission by GARD
because, as an insurer, it was entitled to proceed in the name of
its insured.  See Wager v. Providence Ins. Co., 150 U.S. 99
(1893); The Potomac, 105 U.S. 630 (1881); Hall & Long v. R.R.
Cos, 80 U.S. (13 Wall.) 367 (1871); American R.R. Co. of Porto
Rico v. Mattei, 45 F.2d 307, 308 (1st Cir. 1930).

circumstances of this case and that, in any event, GARD violated

neither Massachusetts General Laws Chapter 176D nor Massachusetts

General Laws Chapter 93A.  It is to these arguments that the

Court turns.

**A. Preemption**

A marine insurance policy is a type of maritime contract

governed by the Admiralty Clause of the Constitution.  <u>Wilburn

Boat Co.</u> v. <u>Fireman's Fund Ins. Co.</u>, 348 U.S. 310, 313 (1955).

GARD cites <u>Southworth Machinery Co., Inc.</u> v. <u>F/V COREY PRIDE</u>, 994

F.2d 37 (1st Cir. 1993), as authority for the proposition that

"an award of attorneys' fees under MGL c. 93A conflicts with

federal maritime law and is preempted."  Claimant Gard's Mem.

Addressing Att'ys' Fees & Settlement Posture ("Gard's Mem.") 8,

ECF No. 40.  The First Circuit, however, held to the contrary in

<u>Southworth</u> that "[u]nder the 'saving to suitors' clause, 28

U.S.C. § 1333(1) [("Section 1333")], claimants in an admiralty

case are not restricted to maritime relief but may also pursue

remedies provided by state law."  <u>Southworth</u>, 994 F.2d at 41.

Section 1333 states the following: "The district courts

shall have original jurisdiction, exclusive of the courts of the

States, of [<u>inter alia</u>]: (1) Any civil case of admiralty or

maritime jurisdiction, <u>saving to suitors in all cases all other

remedies to which they are otherwise entitled</u>."  28 U.S.C. § 1333

(emphasis added).  In preserving for claimants "all other

7

remedies to which they are otherwise entitled," <u>id.</u>, the saving-
to-suitors clause specifically envisages those situations in
which a claimant might bring a claim in a state court of common
law jurisdiction.[3]  But if a claimant may bring a claim in state
court pursuant to the saving-to-suitors clause, there is no
reason in principle why she might not also bring a state law
claim (such as a claim under Chapter 93A) in a federal court
under the federal district court's diversity jurisdiction,[4] so
long as the state law remedy in question is <u>not inconsistent</u> with
federal maritime law.  <u>See</u> <u>Southworth</u>, 994 F.2d at 42.

Southworth is only authority for the proposition that "state

---

[3] For a crisp articulation of the jurisdictional
implications posed by the saving-to-suitors clause, see Barbara
Bennett Woodhouse's excellent article.  Barbara Bennett
Woodhouse, Comment, <u>Powell v. Offshore Navigation, Inc.:</u>
<u>Jurisdiction over Maritime Claims and the Right to Trial by Jury</u>,
82 Colum. L. Rev. 784, 786-87 (1982) ("This saving clause has
been interpreted as preserving the suitor's access to the common
law courts, which had traditionally exercised concurrent
jurisdiction over maritime cases.  It allows a maritime plaintiff
to bring his claim as an <u>in personam</u> tort or contract claim in
state court or as a diversity rather than an admiralty claim in
federal court." (footnote omitted)) (cited in <u>Navigation</u>
<u>Concordia Co., Inc.</u> v. <u>Panek</u>, 115 F.3d 67, 70 (1st Cir. 1997)).

[4] BALTIC COMMANDER and GARD are the in personam defendants.
BALTIC COMMANDER is "a German corporate entity with a principal
place of business in Germany."  Pl.'s Compl. Declaratory J.
Pursuant 28 U.S.C. 2201, Et, Seq. & Civil Rule 57, at 2, ECF No.
1.  GARD is a "citizen or subject of a foreign state that
provides insurance services in exchange for payment."  Massport's
Jury Demand, Countercl., & Answer Declaratory J. Compl.
("Massport's Answer") 2, ECF No. 3.  Here there is diversity, as
Massport is a Massachusetts "body politic and corporate, created
and existing by virtue of Chapter 465 of the Acts of 1956 of
Massachusetts," maintaining a principal place of business in East
Boston.  Massport's Answer 2.

law . . . may not directly contradict [federal maritime law]."
Id. at 41.  The reverse-Erie doctrine to which the Southworth
court refers, id., operates as a limitation on the saving-to-
suitors clause, by specifying that the state law remedy is
preserved only where it does not conflict with substantive
federal maritime law, Offshore Logistics, Inc. v. Tallentire, 477
U.S. 207, 223 (1986) ("[T]he extent to which state law may be
used to remedy maritime injuries is constrained by a so-called
'reverse-Erie' doctrine which requires that the substantive
remedies afforded by the States conform to governing federal
maritime standards.").

Where, however, as here, federal admiralty law does not
conflict with state remedies, the First Circuit has held that
"state law may 'supplement' federal maritime law."  Southworth,
994 F.2d at 41.  The reason why the First Circuit held that
Chapter 93A was preempted in Southworth was because the "conduct
found to violate chapter 93A [fell] squarely within the focus of
existing maritime law."  Southworth, 994 F.2d at 42.  There, the
alleged breach of an express warranty was held to be "a standard
contractual breach to which maritime law has always applied."
Id. (citing Zych v. Unidentified, Wrecked & Abandoned Vessel,
Believed to Be the "Seabird," 941 F.2d 525, 531 (7th Cir. 1991)).
The present claim, however, sounding in state law under Chapters
93A and 176D relates to unfair settlement practices, which, by

9

contrast, are not claims to which maritime law has always
applied.

      1.   The <u>Wilburn Boat</u> Formulation

     States have long been held to have an interest in the
regulation of insurance contracts and the resolution of insurance
disputes.  <u>Wilburn Boat</u>, 348 U.S. at 313-14.  In <u>Wilburn Boat</u>,
the Supreme Court laid out the jurisdictional relationship
between state and admiralty law as follows:

>     Since the insurance policy here sued on is a maritime
> contract the Admiralty Clause of the Constitution brings it
> within federal jurisdiction.  But it does not follow, as the
> courts below seemed to think, that every term in every
> maritime contract can only be controlled by some federally
> defined admiralty rule.  In the field of maritime contracts as
> in that of maritime torts, the National Government has left
> much regulatory power in the States.  As later discussed in
> more detail, this state regulatory power, exercised with
> federal consent or acquiescence, has <u>always been particularly
> broad in relation to insurance companies and the contracts
> they make</u>.

<u>Id.</u> (emphasis added) (footnotes omitted) (citation omitted).  As
the Supreme Court noted in <u>Wilburn Boat</u>, Congress has not
preempted the field by regulating marine insurance contracts so
there is "no possible question here of conflict between state law
and any federal statute."  <u>Id.</u> at 314.

     The question remains, however, whether the federal courts
have constructed rules -- in the absence of Congressional
legislation -- that regulate admiralty in this domain.  The
Supreme Court has furnished us with the following framework for
analyzing whether federal law preempts: "(1) Is there a

judicially established federal admiralty rule governing [here]?
(2) If not, should we fashion one?"  <u>Id.</u>

> 2. No Federal Admiralty Rule Governs in this State
>    Action for Unfair Settlement Practices

At least in the context of this claim, the First Circuit has
already answered the Supreme Court's first question in the
negative.  <u>Pace</u> v. <u>Ins. Co. of N. Am.</u>, 838 F.2d 572, 579-81 (1st
Cir. 1988); <u>Windsor Mount Joy Mut. Ins. Co.</u> v. <u>Giragosian</u>, 864 F.
Supp. 239, 244 (D. Mass. 1994) ("In light of the Supreme Court's
decision in [<u>Wilburn Boat</u>], however, regarding matters of
insurance, the Court rules that . . . it is not the admiralty
doctrine of <u>uberrimae fidei</u> which governs the relationship of the
parties here, but rather the insurance contract itself that
governs under the law of Massachusetts."), <u>aff'd</u>, 57 F.3d 50 (1st
Cir. 1995); <u>see also</u> <u>Connolly</u> v. <u>Cont'l Ins.</u>, No. 90-12144-WF,
1993 WL 23612, at *8 n.4 (D. Mass. Jan. 11, 1993) (Wolf, J.) ("At
the beginning of the trial, the court rejected defendants'
suggestion that plaintiff's state law claim was pre-empted by
federal maritime law.").

Moreover, the <u>Southworth</u> court explicitly affirmed that a
bad faith refusal to settle claims, of the kind at issue in <u>Pace</u>
v. <u>Ins. Co. of N. Am.</u>, 838 F.2d 572, 578-79  (1st Cir. 1988), is
an area which typically falls outside the scope of maritime law:

> State statutes providing for attorney's fees may sometimes be
> given effect in admiralty cases, notably, where the attorney's
> fees are awarded incident to a dispute that is not normally a

> subject of maritime law.  For example, in <u>Pace</u> v. <u>Insurance</u>
> <u>Company of North America</u>, 838 F.2d 572, 578-79 (1st Cir.
> 1988), we held that maritime law did not preempt a Rhode
> Island cause of action allowing recovery of damages and
> attorney's fees for an insurer's bad faith refusal to pay or
> settle claims; the refusal to settle claims is normally left
> untouched by maritime law.

<u>Southworth</u>, 994 F.2d at 41.  It might seem, however, that other

First Circuit authority cuts the other way.  In <u>Templeman</u> v.

<u>Chris Craft Corp.</u>, 770 F.2d 245 (1st Cir. 1985), the court held

that, although a Puerto Rico rule providing for attorney's fees

constituted part of the substantive law of the Commonwealth, it

was inapplicable in an admiralty action.  <u>Id.</u> at 250.  <u>Templeman</u>

should be distinguished from the present case.  Where <u>Templeman</u>

concerned a claim sounding in admiralty, the present case

concerns a claim for unfair handling of settlement negotiations

under Massachusetts law.  Although the First Circuit in <u>Templeman</u>

noted that "we have never extended the allowance of such costs

arising under federal law," <u>id.</u> (emphasis omitted), the costs at

issue here do not arise under federal law.  Rather than stemming

directly from the admiralty claim originally at issue, they arise

from a separate state law cause of action for unfair claim

settling practices under Chapters 93A and 176D.

Similarly, while the Second Circuit apparently holds that

federal admiralty law preempts state laws concerning the

allocation of attorneys' fees, it is not insignificant that

"[that] action was, indeed, brought in admiralty." <u>American</u>

Nat'l Fire Ins. Co. v. Kenealy, 72 F.3d 264, 270 (2d Cir. 1995).
In light of the fact that Kenealy concerned an admiralty claim,
it is only authoritative in respect of those cases which concern
a cause of action brought in admiralty.  The same is true of
GARD's references to other out-of-circuit cases, which also
relate to maritime claims rather than those arising out of state
law.  Texas A&M Research Foundation v. Magna Transportation,
Inc., 338 F.3d 394 (5th Cir. 2003), addressed "[t]he
applicability of state law to a maritime contract dispute."  Id.
at 406.  There, the dispute concerned a maritime contract
(governed by maritime law), and not bad faith settlement
practices (which is proscribed under state law).

     Here Massport's claim regarding unfair settlement practices
is a state claim brought under Chapter 93A; the present claim is
not itself an admiralty action, though the underlying factual
matrix gave rise to a separate admiralty claim concerning the
allision itself.  That distinct admiralty claim relating to the
allision does not concern the Court here, as this particular
claim concerns GARD's handling of a possible insurance
settlement, and not the underlying (admiralty) cause of action as
to which Massport was seeking recovery.

          3.   No Direct Conflict Exists Between Chapters 93A and
               176D and Federal Admiralty Law

     It is important to note that here there is no direct
conflict between federal admiralty law and Chapter 93A, given

that -- insofar as each make provision for fee-shifting --  both
require a finding of unfairness.  Chapter 176D concerns "unfair
methods of competition and unfair or deceptive acts or practices
in the business of insurance," Mass. Gen. Laws ch. 176D, § 3,
which is broadly the kind of situation in which federal admiralty
law allows the shifting of attorneys' fees in the judge's
equitable jurisdiction.  There is no contradiction here, as
implied by GARD's own invocation of the Third Circuit's opinion
in Sosebee v. Rath, 893 F.2d 54 (3d Cir. 1990).  In contrast with
Chapters 93A and 176D, the Sosebee court noted that "a general
award of attorneys' fees pursuant to a state statute which does
not require a finding of bad faith directly conflicts with
federal admiralty law."  Id. at 56.  The language of Chapter
176D, Section 3, with its references to "deceit" and
"unfairness," represents precisely the kinds of issues over which
the federal district court may exercise its discretion to shift
fees as matter of federal admiralty law.  As the Supreme Court
has held in admiralty cases elsewhere, fee-shifting falls within
the equitable jurisdiction of the federal courts:

> As we stated in Sprague v. Ticonic Nat. Bank, 307 U.S. 161,
> 164, 59 S.Ct. 777, 779, 83 L.Ed. 1184, allowance of counsel
> fees and other expenses entailed by litigation, but not
> included in the ordinary taxable costs regulated by statute,
> is "part of the historic equity jurisdiction of the federal
> courts."

Vaughan v. Atkinson, 369 U.S. 527, 530 (1962).  Under admiralty
law, a court has "inherent power . . . to assess attorneys' fees

when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons'." Gradmann & Holler GmbH v. Cont'l Lines, S. A., 679 F.2d 272, 274 (1st Cir. 1982) (quoting F.D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116, 129 (1974)).

        4.   This Court Ought Not Fashion Federal Admiralty Law Relating to Insurance

As regards the Wilburn Boat court's second question -- namely, whether federal courts ought fashion federal admiralty law in the insurance field -- the Supreme Court in Wilburn Boat itself expressed intense scepticism as to the merits of prescribing new juridical rules governing admiralty in this field. Wilburn Boat, 348 U.S. at 316 ("The whole judicial and legislative history of insurance regulation in the United States warns us against the judicial creation of admiralty rules to govern marine policy terms and conditions."). There are good reasons of policy which support such federal judicial reticence: fashioning admiralty rules "involves varied policy considerations and is obviously [a choice] which Congress is peculiarly suited to make." Id. at 320.

Accordingly, this Court holds that Chapters 93A and 176D are not here preempted by federal admiralty law.

**B.   Massachusetts General Laws Chapters 176D and 93A**

In pertinent part, Chapter 176D, Section 3, provides as

follows:

> (9) Unfair claim settlement practices: An unfair claim
> settlement practice shall consist of any of the following
> acts or omissions:
> . . . .
> (d) Refusing to pay claims without conducting a
> reasonable investigation based upon all available
> information;
> . . . .
> (f) Failing to effectuate prompt, fair and equitable
> settlements of claims in which liability had become
> reasonably clear;
> (g) Compelling insureds to institute litigation to
> recover amounts due under an insurance policy by offering
> substantially less than the amounts ultimately recovered
> in actions brought by such insureds . . . .

Unfair claim settlement practices as defined above violate

Chapter 93A, Section 2 and result in fee-shifting under Chapter

93A, Section 9(4).

Here Massport claims that GARD's conduct violated sub-

sections (d), (f), and (g) of section 3 of Chapter 176D.   True,

Massport itself hardly negotiated in a proactive manner.   It

never revealed its own clean-up and stabilization costs until

GARD initiated formal discovery.   Moreover, its evaluation of the

case was unrealistic,[5] albeit made in good faith, depending as it

---

[5] This is the second time in as many years that the Court
has observed counsel making decidedly erroneous case evaluations.
See Diaz v. Jitens Hotel Mgmt, Inc., 822 F. Supp. 2d 74 (D. Mass.
2011), aff'd in part and rev'd in part, No. 11-2400, 2012 WL
4841340 (1st Cir. Oct. 12, 2012).   Sadly, this may be another
consequence of the vanishing trial phenomenon.
    The analysis goes like this: As jury trials grow fewer and
fewer, the number of trial attorneys with an actual "feel" for
juries diminishes as well.   Since attorneys are risk averse, they
fear what they do not know.   As a result, if they cannot prevail
on motions to dismiss, for summary judgment, or on some
technicality, they may well themselves adopt the myth that juries

did on an unpersuasive expert report that posited damages the sum
of clean-up costs plus the cost to build a new but weak wharf, an
economically unrealistic hypothetical.

None of this, of course, relieves GARD of its duty to engage
in fair claims settlement practices as required by Massachusetts
General Laws Chapter 176D, Section 3(d), (f), and (g).

GARD has failed to discharge its statutorily imposed duty.
Here, liability was reasonably clear from the very beginning.
What's more, even though Massport was foolish not to disclose
voluntarily its expenditure of $119,100 in clean-up and
stabilization costs, GARD had retained an extremely competent
admiralty practitioner[6] and had to understand that Massport
necessarily would incur substantial and immediate clean-up costs.
Indeed, the $2,500,000 letter of understanding emphatically
underlines this recognition.  Accordingly, while Massport's
chapter 93A demand was unreasonably high, GARD's offer of $10,000
was unreasonably low in light of all the reasonably available
objective data.  Even more unfair was GARD's failure, once it

---

are erratic and unprincipled and, in consequence, may so advise
their clients and seek or recommend settlements that do not
reflect a measured assessment of genuine risks or opportunities.
See Transcript of Proceedings, supra.  Are trial attorneys and
in-house counsel thus complicit in the apparent death spiral of
the American jury?

[6] The Court does not wish to imply that had GARD employed a
novice attorney, it could have reduced its exposure.  The
statutory duty is non-delegable, and GARD acted reasonably in
employing competent counsel.

learned Massport had actually expended $119,100 in clean-up costs, not to offer to pay at least that amount plus something for restoring the "bite" out of the wharf made by its insured's vessel.  Thus, the $75,000 offer likewise violated Massachsetts General Laws Chapter 176D, § 3, (d), (f), and (g).

In contrast, the $200,000 offer made on the eve of trial was reasonable as matter of law, and its rejection by Massport, coupled with Massport's unwillingness further to negotiate, cuts off Massport's right to further attorney's fees.  A last minute offer, however, does not cure a previous violation of Chapter 176D.  See Clegg v. Butler, 424 Mass. 413, 419 (1997) ("Whether a settlement is eventually reached or not, unjust delay subjects the claimant to many of the costs and frustrations that are encountered when litigation must be instituted and no settlement is reached."); Rhodes v. AIG Domestic Claims, Inc., 78 Mass. App. Ct. 299, 309 (2010) ("[T]he purpose of the statutory scheme . . . is not to require the insurer to extend an initial offer that must be accepted by the claimant but, rather, to initiate the process of settlement negotiations promptly and thereby facilitate out-of-court resolution."), aff'd, 461 Mass. 486 (2012); Lane v. Commerce Ins. Co., No. CA 01-0385A, 2003 WL 21362199, at *7 (Mass. Super. Ct. May 8, 2003) (Hely, J.) ("An ordinary defendant in a civil case has the right to holdout and take a longshot case to trial.  The Legislature, however, has

18

imposed a special duty on insurance companies.  The 'reasonably clear' liability standard of G.L. c. 176D, § 3(9)f), require[s] [the insurer] to make a 'prompt' offer of a fair settlement as soon as a complete investigation show[s] a reasonably clear likelihood that [the plaintiff's] negligence would not exceed that of the [insured].")

## III. CONCLUSION

Accordingly, for the reasons stated above, GARD shall pay Massport single damages in the amount of $285,145 plus reasonable attorneys fees and costs to the date when GARD made a reasonable offer of $200,000.

Massport shall have 30 days from the date of this order to submit its petition for such fees.  GARD shall have 30 additional days to file its response.

SO ORDERED.


/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE